## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT RULLO, on behalf of himself and all others similarly situated, | Docket No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| vs. | |
| UNILEVER UNITED STATES, INC., | |
| Defendant. | |

Plaintiff Robert Rullo ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his undersigned counsel, brings this lawsuit against Unilever United States, Inc. ("Unilever"). Plaintiff alleges as follows based on personal knowledge concerning all facts related to himself and based on the investigation of his counsel, and information and belief concerning all other matters

## NATURE OF THE CASE

1.      This is a class action lawsuit brought by Plaintiff on behalf of a national class of all persons who purchased certain Unilever-produced Dove, Nexxus, Suave, TIGI, and TRESemmé dry shampoo aerosol products which have now been recalled by Unilever due to benzene contamination. These dry shampoos are dangerous: they contain a carcinogenic chemical which can cause leukemia and other cancers.

2.      Benzene is a highly flammable chemical, a colorless or light-yellow liquid toxin at room temperature, used primarily as a solvent in the chemical and pharmaceutical industries. According to the U.S. Food and Drug Administration, the U.S. Centers for Disease Control and Prevention, and other public health agencies, benzene can cause cancer and damage the immune system and prevent cells from functioning properly. The World Health Organization and the

International Agency for Research on Cancer have designated benzene a Group 1 carcinogen that can cause leukemia and other blood cancers. In short, a conclusive body of scientific evidence has established the severe risks of benzene exposure, a risk which Unilever knew or should have known about long before its recent recall.

3.    On October 18, 2022, Unilever issued a press release on its website stating: "Unilever United States today issued a voluntary product recall to the consumer level of select lot codes of dry shampoo aerosol products produced prior to October 2021 from Dove, Nexxus, Suave, TIGI (Rockaholic and Bed Head), and TRESemmé due to potentially elevated levels of benzene [the "Recalled Product(s)"]."[1] Unilever noted "[e]xposure to benzene can occur by inhalation, orally, and through the skin and it can result in cancers including leukemia and blood cancer of the bone marrow and blood disorders which can be life threatening." Unilever otherwise downplayed the severe health risks of benzene contamination by stating that benzene is ubiquitous and that an "independent health hazard evaluation" had determined that "daily exposure to benzene in the recalled products at the levels detected in testing would not be expected to cause adverse health consequences."

4.    Benzene's effects vary by whether a person inadvertently inhales or ingests it or gets it on skin and clothing. Symptoms range from dizziness and irregular heartbeat to convulsions and, at very high levels, death. Here, the Recalled Products' instructions inform consumers to spray the contaminated dry shampoo on the roots of their hair and massage into their scalp. In other words, Plaintiff and the Class repeatedly experienced the "one-two punch" of inhaling benzene and massaging and absorbing benzene into the skin of their scalp and hands.

---

[1]    https://www.unileverusa.com/news/press-releases/2022/unilever-issues-voluntary-us-recall-of-select-dry-shampoos-due-to-potential-presence-of-benzene/ (last visited on October 27, 2022).

5.       To make matters worse, Unilever could have easily avoided the Recalled Products' benzene contamination. Unilever produces many aerosol personal care products, including other aerosol hair care products, that do not contain benzene. Likewise, Unilever's competitors produce aerosol dry shampoo products that do not contain benzene.

6.       Unilever knew or should have known of the Recalled Products' benzene contamination well before the October 2022 recall. Unilever was required to subject the Recalled Products to rigorous quality assurance by Unilever's internal guidelines and applicable laws and regulations. If Unilever was aware that there was a risk that the Recalled Products could be contaminated with benzene prior to October 2022 recall, Unilever had an obligation to ameliorate and disclose that risk to consumers. If Unilever was not aware that the Recalled Products could be contaminated with benzene prior to the October 2022 recall, Unilever was reckless and/or negligent as a sophisticated producer of personal care products. The severe risks of benzene and the possibility of benzene contamination during the manufacturing process of aerosol-based personal care products have been well-known and understood for decades.

7.       Upon information and belief, to the extent Unilever disclaimed knowledge of the Recalled Products' benzene contamination prior to the October 2022 recall, Unilever gained actual knowledge of that risk at least as early as July 2021. Around that time, Unilever's top competitors began recalling aerosol products due to the presence of benzene and faced litigation based on those recalls. Moreover, in November 2021, Valisure, an independent laboratory, confirmed the presence of benzene in dozens of aerosol antiperspirants and sunscreens and submitted a citizens' petition to the Food and Drug Administration describing those findings, including that two of Unilever's Suave antiperspirants contained benzene. Unilever ultimately faced numerous lawsuits arising from the Suave contamination beginning in late 2021.

8.      Despite Unilever's knowledge of the pervasive risk of benzene contamination in the Recalled Products, Unilever failed to warn consumers or any wholesalers or retailers in the chain of distribution of this known danger until October 18, 2022. Instead, Unilever chose to maximize its profits and delay the costs of immediately recalling the defective products it sold at the expense of its trusting customers who were unwittingly increasing their exposure to benzene contamination in the Recalled Products and continued to buy the products. Consumers, like Plaintiff, depended on Unilever to disclose those risks but were, instead, presented with false, misleading, or incomplete representations regarding the safety and benefits of the Recalled Products and suffered damages as a result.

9.      In 2021, Plaintiff purchased a Recalled Product, Bedhead Oh Bee Hive Volumizing Dry Shampoo (the "Bedhead Product"), after reviewing product labeling. Plaintiff purchased and used the Recalled Product without any knowledge that it contained benzene or that benzene could cause cancer and other adverse health effects. Plaintiff would not have purchased the Recalled Product had he known of the presence of benzene.

10.     As detailed below, Plaintiff brings warranty, fraudulent concealment, consumer protection, and unjust enrichment claims arising from Unilever's unfair and deceptive business practices in placing the dangerous benzene-contaminated Recalled Products into the stream of commerce. Plaintiff seeks on behalf of himself and the Class (defined below) damages and restitution for Unilever's unlawful conduct.

## PARTIES

11.     Plaintiff is, and was at all relevant times, a resident of Bedford County, Pennsylvania. Plaintiff reviewed the labeling and applied the Bedhead Product as directed on the instructions without any knowledge that the Bedhead Product contained benzene or that benzene posed health risks. Plaintiff would not have purchased the Bedhead Product had he known that it contained dangerous levels of benzene.

12.     Unilever is a Delaware corporation with its principal place of business located at 700 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. From its New Jersey headquarters, Unilever oversaw the production, promotion, distribution, and sale of various consumer products, including the Recalled Products, throughout the United States. Unilever's sales and marketing leadership, as well as its accounting, financial, and legal departments, are all based in its New Jersey headquarters. Furthermore, Unilever's marketing, marketing analysis, and sales and financial documents were created and are located at its New Jersey headquarters.

13.     Unilever's participation in the packaging design, marketing, and distribution of the Recalled Products far exceeded that of a mere passive holding company. Unilever—including from its New Jersey headquarters—collaborated in the development, manufacture, distribution, and recall of the Recalled Products, which it purports only "in an abundance of caution" to be now recalling due to the admitted presence of benzene.

14.     Given the foregoing, New Jersey has the most significant relationship to this case, and New Jersey law applies to the claims of individuals who purchased Recalled Products both within and outside of New Jersey.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Minimal diversity exists between members of the class (defined below) and Unilever: Unilever is a citizen of New Jersey and Delaware, and Plaintiff is a citizen of Pennsylvania. The amount in controversy in this action exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members in the proposed class (defined below).

16.     This Court has personal jurisdiction over this case because New Jersey is Unilever's principal place of business. Alternatively, Unilever is engaged in systematic and continuous business activity in New Jersey, has sufficient minimum contacts in New Jersey, or otherwise intentionally avails itself of the New Jersey consumer market. Plaintiff's claims arise from conduct Unilever purposefully directed to New Jersey. Unilever—through its management, employees, and agents—directs the production, distribution, promotion, and sale of the Recalled Products through its New Jersey headquarters. Those actions render the Court's exercise of jurisdiction over Unilever appropriate under traditional notions of fair play and substantial justice

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. A substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in this District, and Unilever regularly conducts business and is subject to personal jurisdiction in this District.

18.     All conditions precedent to this action have occurred, been performed, or have been waived.

**FACTUAL ALLEGATIONS**

**A.    Unilever, The Recall, and the Impacted Recalled Products**

19.    Unilever is a large multinational consumer goods company known for its wide range of personal care and hygiene products. Unilever owns over 400 brands selling in 190 countries, including the brands that were subject to Unilever's dry shampoo recall here: Dove, Nexxus, Suave, TIGI, and TRESemme.

20.    According to Unilever, 2.5 billion people use its products each day, and Unilever achieved worldwide sales of approximately $61.9 billion in 2020, with 42% of that revenue specifically derived from personal care products.

21.    Unilever's website emphasizes "Safety First" when it comes to its products. According to Unilever:

> Our long-established Safety & Environmental Assurance Centre (SEAC) works with teams across Unilever to assess the safety and environmental sustainability of our products. The Centre also evaluates the processes used to manufacture our products.
>
> As part of our Responsible Innovation approach, we design safety and sustainability into our products and manufacturing processes using the best science available.[2]

22.    Dry shampoo is a waterless way to freshen and remove dirt and oil from hair using a mixture containing starch and alcohol and generally delivered by an aerosol spray.

23.    On October 18, 2022, Unilever recalled various dry shampoos by issuing a press release on its website stating: "Unilever United States today issued a voluntary product recall to

---

[2]    https://www.unilever.com/planet-and-society/responsible-business/product-safety-and-quality/ (last visited October 27, 2022).

the consumer level of select lot codes of dry shampoo aerosol products produced prior to October 2021 from Dove, Nexxus, Suave, TIGI (Rockaholic and Bed Head), and TRESemmé due to potentially elevated levels of benzene."

24.     Unilever acknowledged that "[e]xposure to benzene can occur by inhalation, orally, and through the skin and it can result in cancers including leukemia and blood cancer of the bone marrow and blood disorders which can be life threatening."

25.     But even while acknowledging that benzene is a known carcinogen, Unilever equivocated on the dangers of benzene, misleadingly suggesting that minimal exposure to benzene is harmless:

> Benzene is ubiquitous in the environment. Humans around the world have daily exposures to it indoors and outdoors from multiple sources.
>
> Based on an independent health hazard evaluation, daily exposure to benzene in the recalled products at the levels detected in testing would not be expected to cause adverse health consequences. Unilever U.S. is recalling these products out of an abundance of caution. Unilever has received no reports of adverse events to date relating to this recall.

26.     Unilever ultimately stated that an internal investigation identified nineteen (19) Recalled Products with elevated levels of benzene: Dove Dry Shampoo Volume and Fullness; Dove Dry Shampoo Fresh Coconut; Dove Dry Shampoo Fresh and Floral; Dove Dry Shampoo Ultra Clean; Dove Dry Shampoo Invisible; Dove Dry Shampoo Detox and Purify; Dove Dry Shampoo Clarifying Charcoal; Dove Dry Shampoo Go Active; Nexxus Dry Shampoo Refreshing Mist; Nexxus Inergy Foam Shampoo; Suave Dry Shampoo Hair Refresher; Suave Professionals Dry Shampoo Refresh and Revive; Tresemme Dry Shampoo Volumizing; Tresemme Dry Shampoo Fresh and Clean; Tresemme Pro Pure Dry Shampoo; Bed Head Oh Bee Hive Dry

Shampoo; Bed Head Oh Bee Hive Volumizing Dry Shampoo; Bed Head Dirty Secret Dry Shampoo; and Bed Head Rockaholic Dirty Secret Dry Shampoo.

**B.    Benzene Is a Very Dangerous Chemical and Known Human Carcinogen**

27.    Benzene is used primarily as a solvent in the chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in gasoline. The major United States source of benzene is petroleum. The health hazards of benzene have been recognized for over one hundred years.

28.    Since at least 1974, human studies have confirmed benzene as a carcinogen capable of causing damage to the bone marrow and red blood cells and leukemia. In 2009, the finding that benzene was a human carcinogen was reaffirmed for acute myeloid leukemia and acute non-lymphocytic leukemia; acute lymphocytic leukemia; chronic lymphocytic leukemia; multiple myeloma; and non-Hodgkin lymphoma.

29.    In 2018, the International Agency for Research on Cancer ("IARC") noted that:

> In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on sufficient evidence of carcinogenicity in humans, sufficient evidence of carcinogenicity in experimental animals, and strong mechanistic evidence. . . . In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[3]

30.    The Centers for Disease Control and Prevention ("CDC") notes that the long-term health effects of exposure to benzene include harm to the bone marrow and decrease in red blood

---

[3] *See Benzene,* IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS, Volume 120 (2018).

cells, irregular menstrual period, and a decrease in the size of ovaries; and leukemia.[4]

31.    The U.S. Department of Health and Human Services ("DHHS") has also determined that benzene causes cancer in humans, including leukemia.

32.    The FDA instructs that there is no safe level of benzene, and thus it "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity." FDA guidance provides that "if [benzene's] use is unavoidable in order to produce a drug product with a significant therapeutic advance, then [its] levels should be restricted" to 2 parts per million ("ppm").

33.    The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm for over 10 hours and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes.

34.    Long-term exposure to benzene causes harmful effects on the bone marrow and can cause a decrease in red blood cells, leading to anemia. It can also cause excessive bleeding and can affect the immune system, increasing the chance for infection. Benzene is one of the most studied and concerning human carcinogens known; its association with forming blood cancers in humans has been shown in numerous studies.

35.    Benzene's effects vary by whether a person inadvertently inhales or ingests it or gets it on skin and clothing. Symptoms range from dizziness and irregular heartbeat to convulsions and, at very high levels, death.

36.    Skin absorption is particularly concerning as there have been multiple FDA studies

---

[4] See CDC, Facts About Benzene (2018),
https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last visited October 27, 2022)

showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.

37.    Benzene exposure from body sprays is especially troubling because the spray is applied directly onto the skin, with the remnants in the air likely to be inhaled by the user and absorbed into their lungs. Thus, even a relatively low concentration limit can result in very high total benzene exposure.

38.    Due to these significant health risks, the World Health Organization and the International Agency for Research on Cancer classify benzene as a Group 1 compound that is carcinogenic to humans.[5]

39.    Despite substantial scientific authority showing that any exposure to benzene can be dangerous and should be avoided, Unilever misleadingly stated in its press release that minimal exposure to benzene poses little risks for users of the Recalled Products, vaguely referencing an "independent health hazard evaluation" to support that baseless assertion.

C.    **Unilever Knew That the Recalled Products Contained Benzene Since At Least 2021**

40.    Upon information and belief, Unilever understood that the Recalled Products contained dangerous levels of benzene since at least 2021 based on consumer advocacy group complaints and numerous recalls of aerosol-based personal care products and sunscreens and resulting lawsuits, including the 2021 recall (and resulting litigation) relating to Suave aerosol antiperspirants produced by Unilever.

41.    Throughout 2021, the risks of benzene contamination became apparent to all producers of aerosol-based personal care products, including Unilever, as there were at least seven

---

[5]    *See* WHO, Exposure To Benzene: A Major Public Health Concern https://www.who.int/publications/i/item/WHO-CED-PHE-EPE-19.4.2 (last visited October 27, 2022).

nationwide recalls of aerosol-based personal care products between 2021 and 2022, including dry shampoos, that were produced and sold by leading personal care companies, including Johnson & Johnson Consumer, Inc. ("JJCI"), The Procter & Gamble Company ("P&G"), and Unilever itself.

42.    In July 2021, JCCI recalled five Neutrogena and Aveeno aerosol spray sunscreen product lines after internal testing identified the presence of benzene.

43.    In September 2021, Beiersdorf AG recalled five Coppertone aerosol spray sunscreen products due the presence of benzene.

44.    In October 2021, Bayer U.S. LLC recalled Lotrimin AF and Tinactin antifungal aerosol spray products due to the presence of benzene.

45.    In November 2021, Blistex recalled two Odor-Eater antifungal and foot odor-reducing aerosol spray products due to the presence of benzene.

46.    In November 2021, P&G discontinued and recalled aerosol dry shampoo products from its Hair Food and Old Spice brands due to the presence of benzene.

47.    Later, in December 2021, P&G recalled aerosol dry conditioner spray products and aerosol dry shampoo spray products from Pantene, Aussie, Herbal Essences, and Waterless produced in the United States.

48.    In March 2022, Unilever recalled two Suave 24-Hour Protection aerosol spray antiperspirants after an internal review showed the presence of benzene. Unilever initially resisted issuing a voluntary recall even though it was on notice as early as November 2021 that the Suave products contained dangerous levels of benzene (discussed directly below).

49.    The widespread recalls of aerosol-based consumer products occurred contemporaneously with independent testing of various antiperspirants and sunscreens by Valisure, an independent laboratory with a core mission "to help ensure the safety, quality, and

consistence of medications and supplements in the market."

50.     In November 2021, Valisure tested for benzene in various types of antiperspirants utilizing gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation that allows mass spectral separation. 54% of samples tested by Valisure contained detectable benzene and some batches contained up to nine times the conditionally restricted FDA concentration limit of 2 parts per million (ppm), including the Suave products sold by Unilever.

51.     The Valisure testing essentially confirmed that consumers using aerosol products were unwittingly being barraged by benzene, a highly dangerous carcinogen, by an industry that either knew that their products contained benzene or failed to take the proper steps to find out that their products contained benzene.

52.     Unsurprisingly, numerous lawsuits were filed by consumers who purchased the carcinogenic products sold by Unilever and its competitors beginning in 2021, with some of those lawsuits resulting in consolidation and coordination by the United States Panel for Multidistrict Litigation, and some of those suits resulting in class-wide settlements for aggrieved consumers. *See generally In re Procter & Gamble Aerosol Products Marketing and Sales Practices Litig.*, No.2:22-md-3025-MHW-CMV (S.D. Ohio); *Barnes v. Unilever United States, Inc.*, No. 1:21-cv-6191 (N.D. Ill.) (lawsuit arising from sale of benzene contaminated Suave products); *In re Johnson and Johnson Aerosol Sunscreen, Marketing, Sales Practices and Prod. Liability Litig.*, No. 0:21-md-03015-AHS (S.D. Fla.).

53.     Upon information and belief, Unilever was well-aware of the danger that the Recalled Products contained benzene at or around the time its competitors began recalling similar products in July 2021 and Valisure revealed the results of its tests in November 2021, and Unilever may have been aware of that danger even prior to that time but chose to ignore that risk to achieve

greater profit.

54.    Aerosols contain volatile hydrocarbons, like butane or isobutane, as propellants. These propellants are derived from crude oil and manufactured in oil refineries where a variety of other hydrocarbons, including benzene, are produced.

55.    Because the chemicals are derived from the same sources in the same facilities, there is high potential for benzene contamination in the processing of butane.

56.    Manufacturing companies that work with butane understand the risks of benzene contamination.

57.    Unilever, a large, sophisticated corporation in the business of manufacturing, distributing, and selling products containing aerosol propellants such as butane, knew or should have known of the risks of benzene contamination.

58.    Unilever's use of butane as a propellant therefore put Unilever on notice of the risk of benzene contamination in the Recalled Products.

59.    Benzene is not listed on the Recalled Products' labels as either an active or inactive ingredient, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Recalled Products.

60.    Unilever has engaged in deceptive, untrue, and misleading advertising by making representations regarding the safety of the Products, including assuring consumers that safety was Unilever's top priority and that the Recalled Products were vigorously tested for safety prior to their distribution and sale.

61.    Unilever made all these assurances regarding the safety and quality of its Recalled Products without disclosing to consumers that its Products contain elevated levels of a cancer-causing chemical (benzene). Additionally, although the Recalled Products were found to

contain benzene, Unilever does not list benzene among the active or inactive ingredients anywhere on its website, and nothing on the Recalled Products' labels otherwise insinuate, state, or warn that the Products contain benzene. Those misrepresentations and omissions mislead consumers regarding the safety and quality of the Recalled Products.

62.     If Unilever had fulfilled its quality assurance obligations, Unilever would have identified the presence of the benzene contaminant through routine and required testing.

63.     Further, had Unilever adequately tested its Products for benzene and other carcinogens and impurities, it would have discovered that its Recalled Products contained benzene—even at levels above the FDA's limit (to the extent even applicable where the inclusion of benzene is unavoidable), making the Recalled Products illegal to distribute, market, and sell.

64.     Unilever also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."

65.     Accordingly, Unilever knowingly, recklessly, or at least negligently, introduced contaminated, adulterated, and misbranded Recalled Products containing (or that risked containing) dangerous amounts of benzene into the U.S. market, including Recalled Products adulterated and misbranded under relevant provisions of the Food, Drug, and Cosmetic Act and the Federal Trade Commission Act. By marketing and selling its Recalled Products in the stream of commerce with the intent that its Recalled Products would be purchased by Plaintiff and the Class, Unilever warrants that the Products are safe to use rather than adulterated products containing a dangerous, cancer-causing chemical.

66.     Unilever did not disclose the actual or potential presence of benzene in its dry shampoo products on the Recalled Products' labeling, advertising, or marketing, or before

selling the Recalled Products.

67.     Based on mandated regulatory and internal quality assurance programs, Unilever knew or should have known that the Recalled Products contained benzene well before its competitors began recalling benzene-contaminated products in July 2021 and before the independent laboratory testing by Valisure in November 2021. Even so, by July 2021, Unilever could no longer withhold information regarding the risk of benzene contamination or keep its head in the sand, initiating an internal investigation sometime in 2021 that conclusively revealed the presence of benzene in the Recalled Products and ultimately to the October 2022 recall of the Recalled Products at issue in this case.

**D.    Plaintiff Purchased a Recalled Product and Used It on His Hair and Scalp Without Knowing that the Recalled Product Contained Benzene**

68.     In or about 2021, Plaintiff purchased the Bedhead Product, a TIGI brand dry shampoo that was a Recalled Product and subject to Unilever's October 2022 recall.

69.     Plaintiff reviewed the labeling and applied the Bedhead Product as directed. The front of bottle states: "Day 2 Hair." The rear of the bottle states "Let Your Creativity Rule" . . . "Day 2 or 3 (we won't tell) doesn't need to mean limp and lifeless. This dry shampoo won't weigh your days down. With a superfine powder that absorbs excess oils, leaving your hair with crazy body and volume." The rear label also contains a section stating "**TO USE**: Shake well before use. Lift hair and spray lightly on roots in short bursts from 10-12 inches away. Use hands to massage into scalp and then brush out."

70.     The Bedhead Product's ingredients section does not disclose that the Bedhead Product contains benzene. Likewise, the Bedhead Product's warning section does not disclose that the Bedhead Product contains benzene or the risk that benzene can cause cancer and other adverse health effects.

71.     Plaintiff used the Bedhead Product as directed on the instructions between _2021 and Unilever's October 2022 recall without any knowledge that the Bedhead Product contained dangerous levels of benzene or that benzene could cause cancer and other injuries.

72.     Plaintiff would not have purchased the Bedhead Product had he known that it contained benzene.

## CLASS ACTION ALLEGATIONS

73.     Plaintiff seeks to represent and certify the following class:

> All United States residents who purchased Unilever's Recalled Products during the applicable statute of limitations (the "Class").

> The Class excludes any judge or magistrate assigned to this case, Unilever, Unilever's officers, directors, legal representatives, successors, and assigns, and any entity in which Unilever has a controlling interest

74.     <u>Numerosity</u>: This proposed class action involves nineteen (19) products purchased by thousands of individuals. As a result, the Class is so numerous that joinder of all members is impracticable.

75.     <u>Typicality</u>: Plaintiff's claims are typical of those belonging to every member of the Class. Plaintiff and every member of the Class purchased the Recalled Products after being exposed to Unilever's misrepresentations and/or without material information only Unilever knew regarding the Recalled Products' benzene contamination, but which Unilever withheld from consumers, including Plaintiff and the Class.

76.     <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class, and Plaintiff has retained counsel experienced in complex class action litigation.  Plaintiff and his chosen counsel have no interests adverse to those of the Class that he seeks to represent.

**A.      Rule 23(b)(1)**

77.     Class action status is warranted under Rule 23(b)(1)(A). Prosecuting separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Unilever.

78.     Class action status is also warranted under Rule 23(b)(1)(B). Prosecuting separate actions by individual members of the Class would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

**B.      Rule 23(b)(2)**

79.     This action is appropriate as a class action pursuant to Rule 23(b)(2) because Unilever has acted in a manner generally applicable to the Class by designing, manufacturing, distributing, and selling unreasonably dangerous Recalled Products containing benzene.

**C.      Rule 23(b)(3)**

80.     Common questions of law and fact exist as to every member of the Class and predominate over any questions solely affecting individual members of the Class, including:

a)      Whether the Recalled Products contained benzene and, if so, at what concentration;

b)      Whether the benzene levels detected in the Recalled Products posed a safety risk to consumers or made the products unfit for sale;

c)      Whether Unilever knew or should have known that the Recalled Products contained unsafe levels of benzene;

d)      Whether Unilever had a duty to disclose that the Recalled Products contained unsafe levels of benzene;

e)      Whether Unilever breached the Recalled Products' warranties;

f)      Whether Unilever violated the New Jersey Consumer Fraud Act;

g)      Whether Unilever was unjustly enriched because of its misrepresentations and omissions concerning the Recalled Products' benzene contamination; and

h)      Whether Plaintiff and the Class are entitled to damages and restitution.

81.     A class action is also superior to other available means for the fair and efficient adjudication of this controversy for other reasons. The injuries suffered by individual members of the Class, though important to them, are relatively small compared to the burden and expense of individual prosecution needed to address Unilever's misconduct. Individualized litigation presents a potential for inconsistent or contradictory judgments. In contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

82.     The proposed Class is defined by objective criteria so that it is administratively feasible for the Court to determine whether a particular individual is a member. Individual class members can be identified through affidavits and/or reference to documents in Unilever's possession, custody, or control without resort to a mini-hearing on the merits

83.     Plaintiff cannot be certain of the form and manner of proposed notice to members of the Class until the Class is finally defined and discovery is completed regarding the identity of members of the Class. Plaintiff anticipates, however, that notice by mail will be given to members of the Class who can be identified specifically. In addition, notice may be published in appropriate publications, on the internet, in press releases, and in similar communications in a way that is

targeted to reach members of the Class. The cost of notice, after class certification, trial, or settlement before trial, should be borne by Unilever.

84.    Plaintiff reserves the right to modify or amend the definition of the proposed Class at any time before the Class is certified by the Court.

## FIRST CLAIM FOR RELIEF
## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT

85.    Plaintiff re-alleges and incorporates the allegations made elsewhere in the Complaint as if set forth fully herein.

86.    Plaintiff brings this claim on behalf of himself and on behalf of the Class.

87.    The New Jersey Consumer Fraud Act ("NJCFA") declares it to be an unlawful practice for "any person" to use an "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact . . . in connection with the sale or advertisement of any merchandise." N.J.S.A. 56:8-2.

88.    The legislature intended the NJCFA to be "one of the strongest consumer protection laws in the nation." *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 15, 647 A.2d 454, 460 (1994). The NJCFA is considered "remedial legislation," and courts therefore construe its prohibitions "liberally to accomplish its broad purpose of safeguarding the public." *Lee v. Carter-Reed Co.*, 203 N.J. 496, 522, 4 A.3d 561, 577 (2010)).

89.    The NJCFA broadly defines "person" to "include any natural person or his legal representative, partnership, corporation, company, trust, business entity or association." N.J.S.A. 56:8-1(d). Here, Unilever is a "person" under the NJCFA.

90.    The NJCFA broadly defines "merchandise" as "any objects, wares, goods, commodities, services, or anything offered, directly or indirectly to the public for sale." N.J.S.A.

56:8-1(c). Here, Unilever offered the Recalled Products, constituting "merchandise" under the NJCFA, to the public for sale.

91.    Unilever's conduct in misrepresenting the benefits of its Recalled Products and/or omitting material information from the Recalled Products' labels constitutes the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, and unfair practices in the conduct of Unilever's trade or commerce.

92.    Unilever also knowingly concealed, suppressed, and consciously omitted material facts to Plaintiff and other members of the Class, knowing that consumers would rely on the advertisements, packaging, and Unilever's uniform representations to purchase the Recalled Products.

93.    Once the defect in the Recalled Products and its tendency to cause cancer in humans became apparent to Unilever, consumers (Plaintiff and other members of the Class) were entitled to disclosure of that fact because a significant risk of the Recalled Products potentially being adulterated with and containing harmful levels of benzene, a human carcinogen, would be a material fact in a consumer's decision-making process, and, without Unilever's disclosure, consumers would not necessarily know that there is such a risk.

94.    Unilever intended that Plaintiff and the Class would rely on the continued deception by purchasing the Recalled Products, unaware of the material facts and omissions described above. Unilever knew that its customers would continue to rely on its representations and omissions that the ingredients in its Recalled Products were safe, effective and were not adulterated with benzene, and knew that consumers would continue to rely upon its silence as to any known risk of the presence of a carcinogenic and toxic chemical impurity, as evidence that the Recalled Products were safe. This conduct constitutes consumer fraud within the meaning of the NJCFA.

95.     Unilever's sale of adulterated and misbranded products containing benzene, a cancer-causing chemical, and the material non-disclosure set forth above constitutes an unconscionable commercial practice, deception, fraud, false promise, misrepresentation and/or omission of material facts as to the nature of the goods, in violation of the NJCFA.

96.     There is a causal relationship between Unilever's unlawful conduct and Plaintiff's and the Class's losses. Plaintiff and other members of the Class purchased the Recalled Products without knowing that the Recalled Products contained dangerous levels of benzene. Had Plaintiff, the Class, and the consuming public known that the Recalled Products were contaminated with benzene, they would not have purchased the Products or would have paid less for them.

97.     Unilever's unconscionable commercial practices, along with its misrepresentations and omissions, make Unilever liable to the Plaintiff and other class members under N.J.S.A. 56:8-2.11 and N.J.S.A. 56:8-2.12, which provide that "[a]ny person violating the provisions of the within act shall be liable for a refund of all moneys acquired by means of any practice declared to be unlawful." Defendant is further liable to Plaintiff and other class members for treble damages, attorneys' fees, and costs under N.J.S.A. 56:8-19.

## SECOND CLAIM FOR RELIEF
## BREACH OF IMPLIED WARRANTY

98.     Plaintiff re-alleges and incorporates the allegations made elsewhere in the Complaint as if set forth fully herein.

99.     Plaintiff brings this claim on behalf of himself and on behalf of the Class.

100.    Unilever is a merchant and was at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the Recalled Products.

101.    The Recalled Products are "goods" under the relevant laws, and Unilever knew or had reason to know of the specific use for which the Recalled Products, as goods, were purchased.

102.    The implied warranty of merchantability included with the sale of the Recalled Products means that Unilever guaranteed that the Products would be fit for the ordinary purposes for which dry shampoos are used and sold (including touching up, freshening, and removing dirt and oil from hair) and were not otherwise injurious to consumers. The implied warranty of merchantability is part of the basis for the benefit of the bargain between Unilever, and Plaintiff and members of the Class.

103.    Unilever breached the implied warranty of merchantability because the Recalled Products are not fit for their ordinary purpose of providing reasonably reliable and safe use as hair care products because the Recalled Products contain benzene, a known and dangerous carcinogen. The Recalled Products are not fit for their particular purpose of touching up, freshening, and removing dirt and oil.

104.    Unilever's implied warranty applies to the purchaser of the Recalled Products, creating privity between Unilever and Plaintiff and members of the Class.

105.    However, privity is not required because Plaintiff and members of the Class are the intended beneficiaries of Unilever's warranties and its sale through retailers. Unilever's retailers were not intended to be the ultimate consumers of the Recalled Products and have no rights under the warranty agreements. Unilever's warranties were designed for and intended to benefit the consumer only, including Plaintiff and members of the Class.

106.    Unilever has been provided sufficient notice of its breaches of implied warranties associated with the Products. Upon information and belief, Unilever was put on actual or constructive notice of its breaches through its own product testing of its cosmetic products, including the Recalled Products; product testing by consumer advocacy groups of Unilever's cosmetic products; reports of similar benzene contaminations in Unilever's other cosmetic

products and competitors' cosmetic products; and complaints from consumers and consumer advocacy groups regarding benzene contamination in Unilever's cosmetic products.

107.    Had Plaintiff, Class Members, and the consuming public known that the Products were contaminated with benzene, they would not have purchased the Products or would have paid less for them.

108.    As a direct and proximate result of the foregoing, Plaintiff and members of the Class suffered and continue to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

**THIRD CLAIM FOR RELIEF**
**FRAUDULENT CONCEALMENT**

109.    Plaintiff re-alleges and incorporates the allegations made elsewhere in the Complaint as if set forth fully herein.

110.    Plaintiff brings this claim on behalf of himself and on behalf of the Class.

111.    Unilever had a duty to disclose material facts to Plaintiff and the Class given their relationship as contracting parties and intended users of the Recalled Products. Unilever also had a duty to disclose material facts to Plaintiff and the Class, namely that it was in fact manufacturing, distributing, and selling harmful Recalled Products unfit for human use, because Defendant had superior knowledge and sophistication such that the transactions without the disclosure were rendered inherently unfair.

112.    Unilever possessed knowledge of these material facts. Since at least mid-2021, numerous recalls, including recalls of other Unilever products, put Unilever on actual or constructive notice that adulterated and misbranded products were being investigated for contamination with carcinogens, including benzene.

113.    During this time, Plaintiff and members of the Class were using the Recalled Products without knowing they contained dangerous levels of benzene.

114.    Unilever failed to discharge its duty to disclose these materials facts.

115.    By failing to disclose these material facts to Plaintiff and the Class, Unilever intended to hide from Plaintiff and the Class that they were purchasing and consuming the Recalled Products with harmful defects that were unfit for human use, and thus Unilever acted with scienter and/or an intent to defraud.

116.    Plaintiff and the Class reasonably relied on Unilever's failure to disclose insofar as they would not have purchased the defective Products manufactured and sold by Unilever had they known they contained unsafe levels of benzene.

117.    Had Plaintiff, Class Members, and the consuming public known that the Recalled Products were contaminated with benzene, they would not have purchased the Products or would have paid far less for them.

118.    Therefore, as a direct and proximate cause of Unilever's fraudulent concealment, Plaintiff, and the Class, suffered damages in the amount of monies paid for the defective Products.

119.    As a result of Unilever's willful and malicious conduct, punitive damages are warranted.

## FOURTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT

120.    Plaintiff re-alleges and incorporates the allegations made elsewhere in the Complaint as if set forth fully herein.

121.    Plaintiff brings this claim on behalf of himself and on behalf of the Class.

122.    Plaintiff, and the other members of the Class, conferred benefits on Unilever in the form of monies paid to purchase Defendant's defective and worthless Recalled Products.

123.    Unilever voluntarily accepted and retained this benefit.

124.    Because this benefit was obtained unlawfully, namely by selling and accepting compensation for products unfit for human use, it would be unjust and inequitable for Unilever to retain the benefit without paying the value thereof.

125.    Unilever received benefits in the form of revenues from purchases of the Recalled Products to the detriment of Plaintiff and the other members of the Class because Plaintiff, and members of the Class, purchased mislabeled products that were not what they bargained for and were not safe.

126.    Unilever has been unjustly enriched in retaining the revenues derived from the purchases of the Recalled Products by Plaintiff and the other members of the Class. Retention of those monies under these circumstances is unjust and inequitable because Unilever's labeling of the Recalled Products was misleading to consumers, which caused injuries to Plaintiff and members of the Class, because they would have not purchased the Products had they known the true facts.

127.    Because Unilever's retention of the non-gratuitous benefits conferred on it by Plaintiff and members of the Class is unjust and inequitable, Unilever must pay restitution to Plaintiff and members of the Class for its unjust enrichment, as ordered by the Court.

## JURY DEMAND

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for relief as follows:

a) An Order certifying this action to proceed on behalf of the Class and appointing Plaintiff and the counsel listed below to represent the Class;

b) An Order awarding Plaintiff and Class members compensatory, actual, statutory, punitive or exemplary damages, restitution, and/or disgorgement along with such other equitable relief as the Court deems proper;

c) An Order awarding Plaintiff attorneys' fees and other costs; and

d) An Order awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b), Plaintiff and the Class demand a trial by jury

Dated: November 2, 2022

**SQUITIERI & FEARON, LLP**

By: /s/ Olimpio Lee Squitieri
Olimpio Lee Squitieri
Stephen J. Fearon, Jr.[6]
305 Broadway, 7th Floor
New York, New York 10007
P: (212) 421-6492
F. (212) 421-6553
lee@sfclasslaw.com
stephen@sfclasslaw.com

**JOSEPH R. SANTOLI**
340 Devon Court
Ridgewood, New Jersey 07450
(201) 926-9200
josephsantoli002@gmail.com

*Attorneys for Plaintiff Robert Rullo*

---

[6]  *Pro hac vice* motion forthcoming.